Filed 10/15/14  In re Jacob G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JACOB G., a Person Coming Under the Juvenile Court Law. | B254578<br>(Los Angeles County<br>Super. Ct. No. CK89123) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMIE C.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Javier Garibay, under appointment by the Court of Appeal for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel and Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

1

Jamie C. ("mother") challenges the propriety of the orders of the juvenile court denying her petition, under Welfare and Institutions Code[1] section 388, for reconsideration of the court's previous order terminating her rights to reunification services, denying her request for relief under section 366.26, subdivision (c)(1), the so-called beneficial relationship exception to termination of parental rights, and terminating her parental rights to her child, Jacob G.  Finding no error, we affirm.

*Factual and Procedural Background*

The initial contact between the Department of Children and Family Services ("DCFS") and this family occurred on June 28, 2011, following a referral alleging physical abuse and general neglect of six-month-old Jacob by mother and Oscar G. ("father").  DCFS was not, however, able to speak with the parents until an altercation ensued between parents and the maternal grandmother resulting in law enforcement involvement.  On July 26, 2011, DCFS made contact with mother and father at the Hawthorne Police Department.  Upon assessing the child, the child social worker ("CSW") observed abscesses on the child's head.  Mother stated that she had observed them three days prior, but had not sought medical treatment.  She said she was going to go to the hospital that very day, but then the altercation occurred.

Jacob was taken to the Long Beach Memorial Hospital by mother and father. When interviewed by the CSW, mother said that she brought her son in to the hospital because he had a boil on his head which had grown very large.  In addition to the abscesses on his head, an X-ray revealed that the minor also had a fractured skull.

The CSW asked mother if any of the physicians had talked to her about her son's medical condition.  She said, "Well they said they might operate to get the boil out."  The CSW then asked mother if anybody told her about a head injury that her child sustained and she stated, "No."  The CSW then asked mother if the child had fallen down from a

---

[1]     All references in this opinion to a code section refer to the Welfare and Institutions Code, unless otherwise indicated.

2

height and she replied, "No, not that I know of." The CSW then asked mother if she was aware that the child was X-rayed and, if so, was she told the result of the X-ray. Mother said, "Yes, they said one of the bones in his head is cracked." The CSW asked mother what she thinks would have caused a six-month-old child to have a cracked skull. Mother stated, "I don't know." The CSW then stated that most six-month-old children do not have fractures of the head unless caused by a trauma and mother then stated: "Oh! I remember, me and my boyfriend were in the laundr[o]mat and the baby was in the car seat and he fell to the floor." She said that she didn't know what caused him to fall. Though mother denied there was domestic violence in her household, there are documented law enforcement responses to the home for domestic disturbances.

During the interview at the hospital, mother was sluggish and lethargic. The CSW asked her if she had taken methamphetamine and she stated, "No. I do not have that problem." The CSW asked her if any of the social workers from the Regional Office told her to take a drug test and mother stated yes, but she did not do so because her baby was ill and she had no transportation. She also said she could not find her ID card. She said her boyfriend did not use illegal drugs.

The nurse providing primary care to the child informed the CSW that the DCFS and the police had been looking for mother and the child. Apparently, maternal grandmother ("MGM"), mother and father had gotten into an altercation, and when law enforcement was called, mother and the child were detained by the police. Father was accused of vandalizing MGM's car and was arrested, but later released. A DCFS worker was called to the police station. After the DCFS worker observed that the child had boils on his head, she requested that he be taken to a hospital. One of mother's family members had called the sheriff and reported that both mother and her boyfriend were using methamphetamine. Mother was ordered to take a drug test when she arrived at the hospital, but refused to do so. A CT scan was performed on the child, which revealed a slight fracture of the skull.

The CSW also interviewed father. He first stated that he had been told by the doctor that the child's abscesses could have been caused by many things. Then he

3

reported the same incident about the child falling in the laundromat. He did not take the child to the hospital at that time because he did not appear injured, and he had a lot of clothes to wash. He did not tell anyone else about the child's accident. He also denied domestic violence in the household. Father has an extensive criminal history, including several felony convictions. He had several children by different women and is much older than mother. Father was a known member of the street gang Lennox 13 and had previously admitted to a history of methamphetamine use to law enforcement.

Dr. Cindy Njemanze stated that the child's injury was caused by a trauma. She stated that mother's explanation of how the injury to the child's head occurred was not consistent with the location of the fracture. She said that a survey had been ordered and the results were pending. She also indicated that the child would undergo an eye examination to rule out shaken baby syndrome. She said that there was possible child abuse by the child's parents.

Dr. Murray, a child abuse specialist, said that the injury to the child was "highly suspicious for non-accidental trauma." DCFS filed a section 300 petition on August 1, 2011, alleging that the child was physically abused by mother and father. The juvenile court detained the child in foster care and granted the mother monitored visitations of three times per week.

The juvenile court adjudicated the section 300 petition on November 3, 2011. It sustained the petition, declared the child a dependent of the juvenile court, removed him from parental custody, granted mother monitored visitation with DCFS having discretion to liberalize visits to unmonitored, and ordered reunification services. Mother was ordered to complete hands-on parenting classes and individual counseling to address adequate/necessary protection of the child.

On May 3, 2012, DCFS reported that on October 5, 2011, the child was placed with foster parents, with whom he was comfortable and affectionate. He showed mild delays in gross motor development and began receiving services at Regional Center.

DCFS also reported that mother had enrolled in individual therapy at Multiservice Family Center on September 29, 2011, and was attending bi-weekly sessions. In

4

addition, mother began attending a 12-week parenting class at Ties for Families in April 2012.

As of May 3, 2012, mother had visited the child 26 times and, according to the foster mother, interacted well with the child during visits; the child always appeared happy to see her.

On May 25, 2012, DCFS reported that mother continued to visit the child, and continued to attend parenting classes at Ties for Families. It was reported by the parenting class instructor that mother and child shared a very strong bond, and mother showed "much love" for the child. Mother stopped attending individual therapy at Multiservice Family Center on April 26, 2012, because she stated that "she no longer had medical."

At the May 25, 2012, six-month review hearing, the juvenile court found that mother was in partial compliance with her case plan, and ordered that reunification services continue, setting a 12-month review hearing for October 22, 2012, which was subsequently continued to February 4, 2013.

DCFS filed a Status Review Report on October 22, 2012, which stated that the child was attending parenting classes with mother on a weekly basis and had stopped receiving Regional Center services on June 22, 2012, because he was doing well. He was also doing very well with his foster parents.

Mother had re-commenced individual therapy at Inglewood Medical and Mental Health Services in August 2012. She also completed 12 weeks of parenting classes on June 27, 2012, but her instructor had recommended she continue attending classes. He reported that mother often arrived late, and had difficulty being "emotionally present" during the classes; she would get very anxious and upset, and was working on regulating her emotions and feelings. He also noted that as she became more stressed, it negatively affected the child.

Mother continued to visit with the child subsequent to the six-month review hearing for an additional 23 visits as of October 22, 2012. She would feed, play and talk with him. When she visited with the child on September 15, 2012, mother had a swollen

black eye and bruising on her ear and neck. Mother "continued to be very emotional during visits" and was "not capable of caring for the child because she was not able to control her feelings."

Mother stopped attending therapy in September, resuming on November 7, 2013. Her therapist recommended that she should continue therapy because she was just "starting to realize her past mistakes."

On February 4, 2013, DCFS reported that the child continued to do well with his foster parents, who stated that mother continued to be very emotional and anxious during visits to the point of overwhelming the child. Mother wanted to hold him during visits and would become upset when he wanted to explore his surroundings.

DCFS also reported that mother continued to attend individual therapy on a bi-weekly basis. Her therapist recommended that therapy continue because although mother was making "decent progress," "nothing has really changed." He also stated that she was progressing slowly and needed a lot of guidance.

At the February 4, 2013, 12-month review hearing, the juvenile court found that mother had failed to make significant progress in resolving the problems that led to the child's removal, and had not demonstrated the capacity to complete objectives of her case plan. The court terminated reunification services, ordered an adoptive home study, and set a section 366.26 hearing for June 3, 2013.

On April 23, 2013, mother engaged in another violent altercation with father. Law enforcement noted bruises and marks on mother's arms and legs, but mother refused to press charges against father.

On June 3, 2013, DCFS reported that the minor had been placed with preadoptive parents, Mr. and Mrs. M., on May 8, 2013. The M.'s were committed to the adoption of the child.

Mother was still visiting the child for two hours per week, and the visits were going well, except for the same problem of mother becoming emotional.

At the June 3, 2013, section 366.26 hearing, DCFS recommended termination of parental rights and mother requested a contested hearing. The court calendared a hearing for August 5, 2013.

DCFS filed a Status Review Report on August 5, 2013, noting that mother had been visiting the child for four hours on Tuesdays, except for missing a couple of visits in July. The social worker monitoring the visits had concerns that mother had substance abuse and/or mental issues, as mother seemed "sedated" at times and displayed emotional and "clinging" behavior which negatively affected the child.

On August 5, 2013, mother filed a section 388 petition, requesting a modification of the February 4, 2013 order terminating reunification services, reinstatement of reunification services, and an order to release the child to her custody, or in the alternative, to liberalize her visitation with the child. In support of her request, mother indicated that she completed parenting classes, continued to attend individual counseling, and no longer lived with father. Attached to her section 388 petition was a letter dated July 29, 2013, from her therapist stating that during therapy mother had discussed parenting, relationship issues, and life skills. The therapist also reported that mother was separated from father.

The juvenile court continued the section 366.26 hearing so that it could hold a combined section 388 and section 366.26 hearing on December 11, 2013.

Four days after the filing of her section 388 petition on August 9, 2013, there was another physical altercation between mother and father. Police responded to a domestic violence call. As they approached the residence they could hear mother screaming and crying for help. Police observed mother through a mirror, noticing bruises on her right cheek. They entered the home and arrested father for spousal battery, false imprisonment and battery on a peace officer. Mother told the police that she did not want to talk about the incident, but she admitted she was in a "fight" with father and that she was pregnant with his child.

On August 23, 2013, the juvenile court reduced mother's visitation with the child to one hour per week. This resulted from the child being very unhappy with his last visit

7

with mother, at which time he did not want her to hold him and threw a tantrum. When mother tried to hold the child, he kicked her and pushed her away.

On November 1, 2013, DCFS received a referral alleging that mother gave birth to a child nine days earlier but used a different name because she did not want hospital staff to be aware of her history with DCFS. The reporting party stated that mother was currently using methamphetamines, and that mother acknowledged methamphetamine use within two weeks prior to the birth.

On December 11, 2013, mother filed an amended section 388 petition, which requested that the juvenile court change its order terminating reunification services, order six more months of reunification services, and either release the child to her custody or increase her visitation. In support of her requests, mother indicated that her therapist would testify that she was a fit mother and not a danger to the child, and the child's first foster parents would testify that mother and child share a "natural mother-son bond relationship."

The juvenile court then proceeded with the combined hearing under sections 388 and 366.26. Mother submitted declarations from the child's first foster parents in favor of her position. The child's appointed counsel urged the court to deny the section 388 petition.

The court denied mother's section 388 petition and proceeded to the section 366.26 portion of the hearing. The first foster mother testified that mother and child had a strong bond. Mother's counsel argued that mother had satisfied the exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i). Counsel for the minor asked the court to find the child adoptable and terminate the parental rights of the parents.

The juvenile court found that the child was adoptable and that mother had failed to establish an exception to the statutory presumption for adoption. The court terminated parental rights and ordered adoption as the child's permanent plan.

On February 7, 2014, mother filed a timely notice of appeal.

1. *Mother's Amended Section 388 Petition*

Mother argues that the juvenile court erred in denying her amended section 388 petition. We disagree.

"Section 388 permits a parent to petition the court on the basis of a change of circumstances or new evidence for a hearing to change, modify, or set aside a previous order in the dependency [proceeding]." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The request for the change to the court's order must be viewed within the context of the proceeding as a whole. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) The petitioning parent bears the burden of showing both that a change of circumstance or new evidence exists, and that the proposed change is in the child's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. (*In re Edward H.* [(1996)] 43 Cal.App.4th 584, 594.) '"[C]hildhood does not wait for the parent to become adequate."' (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)" (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

In her amended section 388 petition, mother requests that the order terminating unification services be modified and that she be granted six more months of reunification services and either the immediate release of the child to her, or in the alternative, more liberal visitation.

A juvenile court's denial of a section 388 petition after a full hearing rarely merits reversal. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522.) The decision must be reviewed keeping in mind that "the change of circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485; accord, *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450-1451.)

Whether an order should be modified or set aside as sought in a section 388 petition rests within the sound discretion of the juvenile court and its decision will not be

9

overturned absent a clear abuse of discretion. When applying the abuse of discretion test, the reviewing court should only reverse if the abuse is palpable, that is, no judge could have reasonably made the order being challenged. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) In other words, a trial court determination will not be disturbed unless it exceeds the bounds of reason. (*In re E.B.* (2010) 184 Cal.App.4th 568, 575; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

Moreover, in reviewing the sufficiency of the evidence to support a juvenile court order granting or denying a section 388 petition, we presume in favor of the order, and consider the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Arthur H.* (1994) 27 Cal.App.4th 567, 575.)

a. *Failure to Show a Change of Circumstances.*

This case began in August 2011 when DCFS filed a section 300 petition alleging physical abuse of the child by the parents; the child was detained at that time. The juvenile court adjudicated the section 300 petition on November 3, 2011. The court sustained the petition, declared the child a dependent of the juvenile court, removed him from parental custody, granted mother monitored visitation, and ordered reunification services. Mother was ordered to complete hands-on parenting classes and individual counseling to address adequate/ necessary protection of the child.

The 12-month review hearing was held approximately 15 months later. The mother's therapist reported that mother was making "decent progress," but "nothing really has changed." Mother's parenting class instructor recommended that mother continue her classes because, although she was "very much involved in sessions," she was progressing slowly and needed a lot of guidance. The juvenile court found that mother had failed to make significant progress in resolving the problems leading to the child's removal and had not demonstrated the capacity to complete the objectives of her case plan. The court terminated reunification services, ordered an adoptive home study and scheduled a section 366.26 hearing.

10

In support of her section 388 petition, mother submitted no evidence that circumstances had changed since the time of the 12-month review hearing in February 2013.  Thus, the juvenile court's denial of mother's section 388 petition did not constitute an abuse of discretion.

### b.  *Best interests of the child.*

The second prong of the showing required for a successful section 388 petition is that the petitioning party must demonstrate that the granting of the petition would be in the best interests of the child.  Mother also failed to meet her burden of demonstrating that the requested reunification services would be in the child's best interests.

(i)  *Mother's request for six more months of reunification services.*  No proof was presented that six more months of reunification services would have made any difference.  Mother had attended many parenting classes and individual therapy over a period of 18 months, and the reports from the parenting program and her individual counselor were that mother made little, if any, progress.

Moreover, the court first ordered reunification services for mother at the detention hearing on August 1, 2011, at which time the child was removed from the physical custody of the parents.  Section 361.5, subdivision (a)(1)(B) reflects the Legislature's determination that parents of a dependent child under the age of three are entitled to no more than six months of reunification services.  Section 361.5, subdivision (a)(3) provides, in part, however, that "Notwithstanding paragraphs (1), (2) and (3), court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period . . . ."  Therefore, even if the juvenile court had wanted to further extend reunification services beyond the 18 months already provided, it did not have the authority to do so.

11

(ii) *Mother's request for custody of the child or more visitation.* Mother failed to demonstrate that she was prepared to take custody of the child, since she had made only minimal progress in her court ordered reunification programs. Moreover, despite her assertions to the contrary, the evidence showed that she remained to some extent in her violent relationship with father. In addition, mother presented no evidence that at the time of the hearing on the section 388 petition, liberalizing her visitation with the child would be in the child's best interests. The only evidence presented was that her visitation at this point in time was doing more harm than good. This is why the court had reduced her visitation from four or more hours per week to one hour per week.

Therefore, the juvenile court did not abuse its discretion in finding that the granting of the section 388 petition was not in the best interests of the child.

2. *The Order Terminating the Parental Rights of Mother and Father*

Section 366.26, subdivision (b) states: "At the hearing, which shall be held in juvenile court for all children who are dependents of the juvenile court, the court, in order to provide stable, permanent homes for these children, shall review the report as specified in Section 361.5, 366.21, 366.22, or 366.25, shall indicate that the court has read and considered it, shall receive other evidence that the parties may present, and then shall make findings and orders in the following order of preference: [¶] (1) Terminate the rights of the parent or parents and order that the child be placed for adoption and, upon the filing of a petition for adoption in the juvenile court, order that a hearing be set. The court shall proceed with the adoption after the appellate rights of the natural parents have been exhausted."

Section 366.26, subdivision (c)(1) states in relevant part: "If the court determines, based on the assessment provided as ordered under subdivision (i) of Section 366.21, subdivision (b) or Section 366.22, or subdivision (b) of Section 366.25, and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental right and order the child placed for adoption. . . . A finding under subdivision (b) or paragraph (1) of subdivision (e) of

12

Section 361.5 that reunification services shall not be offered, . . . shall constitute a sufficient basis for termination of parental rights. Under these circumstances, the court shall terminate parental rights unless . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

In the case of *In re Celine R.* (2003) 31 Cal.4th 45, our Supreme Court held: *"*The circumstance that the court has terminated reunification services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of specified circumstances. [§ 366.26, subd. (c)(1).] The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)" (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

The exceptions to the general rule that the court must choose adoption where possible must be considered in view of the legislative preference for adoption where efforts have failed. "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation] to choose an option other than the norm, which remains adoption." (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

In the case of *In re Arthur H., supra,* 27 Cal.App.4th 567, the appellate court quoted the above language from section 366.26, subdivision (c)(1), and then further stated: "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's need for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contacts have continued or developed a significant, positive, emotional attachment from child to parent. [¶] "At the time the court makes its

13

determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent. Social workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court. The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Id.,* at p. 575.)

In the present case, substantial evidence supports the trial court's determination that mother's parental rights should be terminated and the child should be placed for adoption. The court found that the termination the mother/child relationship in the present case would not be detrimental to the child because the relationship was one of friends, not parent and child. The child had been a dependent for all but six months of his young life and needed a stable, permanent home. Mother had progressed very little in either her therapy or parenting skills, and she had only recently separated from her abusive boyfriend, the child's father. Furthermore, based on mother's previous history of breaking-up with father and then reuniting with him until the next act of domestic violence occurs, it is much too early to say she has permanently terminated that relationship.[2]

---

[2] We also note that the court in *In re E.B.*, *supra*, 184 Cal.App.4th 568 discussed the issue of domestic violence in the family vis-à-vis a dependency proceeding. It stated: "A child is within the jurisdiction of the juvenile court under subdivision (b) of section 300 if he or she 'has suffered, or there is a substantial risk that the child will suffer, serious physical harm,' harm that is either 'inflicted nonaccidentally upon the child by the child's parent or guardian' or results from 'the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . .' '[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.) Children can be 'put in a position of physical danger from [spousal] violence' because, 'for example, they could wander into the room where it was occurring and be accidentally hit by a thrown

Regarding whether the beneficial parent-child relationship exception applies in a situation, Division Seven of this District Court of Appeal stated in the recent case of *In re K.P.* (2012) 203 Cal.App.4th 614: "The [*In re*] *Bailey J.* [(2010) 189 Cal.App.4th 1308] court observed that the juvenile court's decision whether an adoption exception applies involved two component determinations: a factual and a discretionary one. The first determination – most commonly whether a beneficial parental or sibling relationship exits, although section 366.26 does contain other exceptions – is, because of its factual nature, properly reviewed for substantial evidence. (*Id.* at p. 1315.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); *Bailey J.,* at p. 1315.) This 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.,* at p. 1315.)" (*In re K.P., supra*, 203 Cal.App.4th at p. 622.)

However, "[t]he practical differences between the [substantial evidence and abuse of discretion] standards of review are not significant. '[E]valuating the factual basis for the exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.'" [Citation.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

object, by a fist, arm, foot or leg. . . .'" (*In re E.B., supra*, 184 Cal.App.4th at pp. 575-576.) "[P]ast violent behavior in a relationship is the 'best predictor of future violence.' Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships." (*Id.* at p. 576.)

15

As previously stated, the appropriate test for determining whether the trial court abused its discretion is whether it exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.  (*In re Stephanie M* . (1994) 7 Cal.4th 295, 318-319.)

Therefore, we hold that the juvenile court's finding that no exceptional situation existed to forego the statutorily-mandated preference for adoption did not constitute an abuse of discretion.

*Disposition*

The challenged rulings of the trial court are affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:


TURNER, P. J.


KRIEGLER, J.

---

[*]     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16